SAMUEL A. AVILA and Others, as Trustees of the INEBRIATES' HOME FOR KINGS COUNTY, Appellants, *v.* THE CITY OF NEW YORK, Respondent.

*Dissolution of an inebriates' home, maintained in greater part by the appropriation of excise moneys — power of the Legislature to direct that the amount expended for real property be repaid to the county treasurer — when, after making such payment, the trustees cannot recover the money so paid.*

The chief source of the income of the Inebriates' Home for Kings County having been excise moneys, collected in Kings county and paid over to the corporation pursuant to statutes passed by the Legislature, it was competent for the Legislature, when directing the dissolution of the corporation by chapter 604 of the Laws of 1898, to provide that the liquidating trustees, out of the proceeds of the sale of real and personal property of the corporation, should pay to the county treasurer of the county of Kings the sum expended by the corporation pursuant to certain designated statutes for the erection and furnishing of buildings for said corporation and for improving the grounds belonging thereto, where, so far as appears, the corporation possessed no real property other than that which had been purchased for a valuable consideration.

In any event, the liquidating trustees, after paying over the moneys as directed by the act of dissolution, cannot recover such moneys, where it does not appear that there are any creditors of the corporation in existence or that the corporation ever received a donation of any lands, the heirs or devisees of the donors of which might claim the reversion of such lands upon the dissolution of the corporation.

APPEAL by the plaintiffs, Samuel A. Avila and others, as trustees of the Inebriates' Home for Kings County, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Kings on the 25th day of October, 1904, upon the report of a referee, dismissing the complaint upon the merits.

Chapter 604 of the Laws of 1898, which is referred to in the opinion, dissolved the corporation known as "The Inebriates' Home for Kings County," and then provided as follows:

"§ 2. Immediately after the passage of this act, the trustees of said Inebriates' Home, now in office, shall proceed forthwith to sell and dispose of the real and personal property belonging to such corporation. They shall sell and dispose of the same in such manner as in their judgment shall procure the highest amount for such property. They shall pay the proceeds realized from the sale of such property and also the cash on hand, if any, belonging at the date of the passage of this act, to such institution, to the county treasurer of the county of Kings, for the purpose of repaying so far as the same may be sufficient, the money expended by such institution under chapter four hundred and eighty-three of the laws of eighteen hundred and sixty-eight, as amended by chapter five hundred and fourteen of the laws of eighteen hundred and seventy-one for the erection and furnishing of buildings for said corporation and improving the grounds belonging thereto.

"§ 3. If, after the repayment of the said moneys, to the county treasurer, and the payment of all just debts of said institution, there shall be any moneys remaining, the same shall be retained by the trustees for their services in connection with said corporation."

*Edward A. Alexander,* for the appellants.

*James D. Bell* [*Richard B. Greenwood* and *John J. Delany* with him on the brief], for the respondent.

Judgment affirmed, with costs, on the opinion of ALBERT G. McDONALD, Esq., referee.

HIRSCHBERG, P. J., BARTLETT, WOODWARD, RICH and MILLER, JJ., concurred.

The following is the opinion of ALBERT G. McDONALD, Esq., Referee:

McDONALD, Referee:

By chapter 843 of the Laws of 1867, passed May ninth of that year, the Inebriates' Home for Kings County was created and incor-

porated with named incorporators and was given the powers and made subject to the restrictions (except as therein modified) of corporations created under the act for the incorporation of benevolent, charitable, scientific and missionary societies, passed April 12, 1848,* for the reformatory objects of receiving and retaining inebriates entering either voluntarily or by force of law, and with the ordinary power of taking and disposing of real and personal property and with authority to receive twelve per cent of all excise moneys for licenses to residents of Kings county and all fines for violations of the Excise Law committed in Kings county, to be applied to its founding and maintenance for the purposes stated, and it was enacted that persons committed for intoxication should be transferred to such home.

By chapter 483 of the Laws of 1868 there was appropriated to the uses of the institution $200,000 of the first moneys received for excise licenses in Kings county, and also annually $10,000 out of the excise money as aforesaid, besides all fines, and further provision was made for commitment of drunkards to the home, and its president was required to report to the Legislature each year concerning its affairs.

By chapter 514 of the Laws of 1871 it was enacted that out of the said $200,000 not less than $75,000 should be expended for erection and furnishing of buildings and improving grounds, while the balance, together with any proceeds of sale of any of its land, should be invested and the income used for maintaining the home.

By chapter 687 of the Laws of 1872 the excise commissioners of Brooklyn and of Kings county towns were directed to pay to the home twelve per cent of all money for licenses in Brooklyn and such towns, to be applied to its founding and support, together with all fines for intoxication or Excise Law violations in Brooklyn and Kings county.

By chapter 627 of the Laws of 1875 there was directed to be paid to the home twelve per cent of all excise money for licenses in Brooklyn and Kings county to such extent only as was certified by the executive committee to be necessary for care and maintenance of indigent poor inebriates in the home, over and above available

---

* See Laws of 1848, chap. 319, as amd.— [REP.

receipts from other sources, while the provision for fines was repealed, and there was further provision for transfer or commitment by magistrates to the home.

By chapter 169 of the Laws of 1877 it was enacted that the balance of such $200,000 and of the proceeds of any sale of lands should be expended and used, in whole or in part, for maintaining the home and in erection, improvement and furnishing of suitable buildings, or invested in securities, and the income used as the corporation deemed necessary, and the twelve per cent allowance out of excise moneys was increased to fifteen per cent, with further provision for commitment by magistrates of drunkards to the home.

During the period of these acts it was the policy and practice of the State to apply to the use of the locality either directly or through the support and maintenance of local benevolent or reformatory agencies, whether under public or private control, moneys received for licenses granted or for fines imposed within the locality.

This is illustrated by chapter 889 of the Laws of 1867, passed May 10, 1867, whereby it was enacted that from and after May 1, 1867, all sums received for licenses and fines in Brooklyn should be paid to the commissioners of the sinking fund of the city, or received in the towns of Kings county to the commissioners of schools, for the benefit of the several and respective school districts, less the percentage then directed by law to be paid to the State Inebriates' Asylum, or any sum then directed by law to be paid to the said Inebriates' Home. And such policy and practice is further illustrated by the Brooklyn charter of 1873, passed June 28, 1873, whereby it was enacted that all moneys collected for licenses in Brooklyn should be for the benefit of the city, except the provision made by law to be paid to said Inebriates' Home (Laws of 1873, chap. 863, tit. 11, § 3); and by chapter 175 of the Laws of 1870, the "act regulating the sale of intoxicating liquors," by section 7 of which the moneys arising from licenses in any town or village were to be deposited with the county treasurer, to be expended for the support of the poor, and the moneys in like manner arising in cities should be paid into the treasuries of the cities; and by the later charter of Brooklyn, by the provisions of which twenty per cent of all moneys for excise licenses or fines in Brooklyn was intercepted

and taken for the police pension fund, and ten per cent for the orphan asylum societies and industrial schools of the city.*

The State has thus exercised the right and recognized the propriety of spending the excise moneys in the locality for the support of the poor or other good public use, through public or *quasi* public agencies. And the provision made for and paid to the Inebriates' Home was thus, by interception, taken out of the treasury of Brooklyn or Kings county. Hence, in the disposition which the dissolution act of 1898 (Chap. 604) directed should be made of a portion of the proceeds of sale of the property of the home, in connection with which the $75,000 in question was paid to the county treasurer, it was sought to return back that much of the excise money which had been thus intercepted.

The principal source from which the Inebriates' Home acquired property was the appropriation out of excise moneys. To some, but evidently a very much smaller extent, it received money from voluntary patients. At the time of its dissolution it owned real estate and personal property, not merely its furniture, but also stocks and bonds and mortgages. All such property was sold by the trustees in dissolution and from the proceeds all the debts of the institution were paid and some $25,000 or $30,000 was divided among the trustees to their own use, and the $75,000 by them deposited with the county treasurer was the whole balance of proceeds remaining.

While there is some vague suggestion respecting some gift or gifts to the institution, yet, according to the deeds put in evidence by its counsel, its real estate was purchased by it for valuable consideration paid by it, and there is no definite evidence of any voluntary grant of real estate to it. The earliest of the deeds in evidence is dated June 30, 1868, and recorded August 24, 1868, subsequent to the receipt by it of a considerable sum from the excise moneys. A comparison of the deeds given by the trustees in liquidation on their sales of real estate shows that the property sold was the same the home had purchased for valuable consideration, and that it was not property which had been donated to the home by private persons, to be held for its corporate purposes only, so long as its corporate

*See Laws of 1888, chap. 583, tit. 11, § 41, subd. 2; Id. tit. 17, § 12. — [REP.

life endured. Its stocks and bonds are said to have represented investments of surplus moneys, and its mortgages portions of the purchase price on its sales of real estate. The proceeds out of the sales in liquidation paid all claims against the institution; and although several years have passed, no further demand of any kind has been made, either on behalf of any creditor or on behalf of any person claiming to be entitled in reversion, or on behalf of any person or corporation whatever.

The theory of the complaint is based on the assertion that the real property sold by the trustees in liquidation was donated to the home by private persons, to be held for its corporate purposes so long as its corporate life endured, and no longer, and that heirs and devisees of the donors are still in being and that the greater part of the $75,000 paid to the county treasurer is proceeds of such real estate But there is no definite evidence of any donation of real estate to the home, or of the existence of any such heirs or devisees, or that any part of the $75,000 is proceeds of donated real estate.

The trustees now claim that the act under which the $75,000 was paid to the county treasurer is unconstitutional, as being alleged to be violative of several recited constitutional provisions, and that the payment was made by the trustees under a mistake of fact on their part, in that they had no knowledge of the fact that the real estate was the donation of private persons, whose heirs and devisees were in being, and also under a mistake as to their right to make such a payment and as to the validity of the act in question, and that by reason of the alleged unconstitutionality of the act, the payment to the county treasurer was a wrongful diversion of the trust funds of the home, so that it is plaintiffs' duty as trustees to recover back the moneys.

In the final condition of the evidence there is a general statement of the existence of heirs of deceased incorporators of the institution, but a denial of any knowledge of the existence of any heirs or devisees of any grantors of its real estate. So there is no evidence of the existence either of any creditor, or of any person claiming or entitled to claim title by reversion.

Concerning the disposition of the surplus property of such an institution, left after payment of its debts, there is no general statutory provision that we have been able to find. In 1872 the Legis-

lature passed an act (Chap. 424) concerning the surplus property of certain religious corporations on dissolution, whereby the State asserted the right to dispose of such surplus to such religious or charitable uses as should be petitioned for by the trustees of the institution, and approved by the Supreme Court. But we find no general statute relating to the surplus left in the present situation.

It seems to be the law concerning the real estate of such an institution, at least such of its real estate as has been purchased by it for a valuable consideration, and concerning its personal property, that the surplus, after payment of its debts, passes to the State. There is, necessarily, a difference between the rules of law applicable to the disposition of the surplus property of such an institution as the Inebriates' Home and the rules applicable in the case of a stock corporation or of a membership corporation whose members were the contributors who created the fund. Many of the cases on behalf of the plaintiffs seem, therefore, inapplicable to this situation.

The State, as we have seen, has always directed the disposition of money which came as the proceeds of liquor licenses or fines for excise violations to the benefit of the locality. And if the surplus of the proceeds of the property of the Inebriates' Home, on its dissolution (and it is not questioned that the Legislature had a right to enact its dissolution), passed to the State, it was proper that the State should assert the right to dispose of it, and to dispose of it by returning it to the locality, the treasury of which originally suffered the loss.

These trustees voluntarily paid the $75,000 to the county treasurer, although now claiming that it was under a mistake. No one has asserted any claim to the fund. The trustees seek to obtain its possession and administration, not because any claim is asserted by any real or alleged *cestui que trust*, but because of the general rule that trustees in liquidation are administrators of the assets of a dissolved corporation and should close up such administration by judicial accounting and decree. But the administration seems to have been completed and the whole surplus to have gone where it should have gone and no one is injured or complains.

The act in question does not seem to be unconstitutional.

And even if on any ground it could have been regarded as unconstitutional, I do not think the present plaintiffs, under the circum-

stances of this case, are, or were when this action was brought, in the position to recover possession of any of the money paid by them to the county treasurer.

· I have, therefore, decided that the complaint should be dismissed on the merits, with costs.